## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SHELLI FRANEK,

      Plaintiff,

                                    Case No. 05-70987

v.                                    Hon. Gerald E. Rosen

THYSSENKRUPP MATERIALS NA, INC. and
THYSSENKRUPP MATERIALS NA, INC.
WELFARE BENEFIT PLAN,

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## REGARDING CROSS-MOTIONS TO REVERSE OR AFFIRM
## DISCONTINUATION OF SHORT-TERM DISABILITY BENEFITS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     January 11, 2007    

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I.  INTRODUCTION

In the present suit, Plaintiff Shelli Franek challenges the decision of Defendant

ThyssenKrupp Materials NA, Inc., her employer and the plan administrator for the

Defendant ThyssenKrupp Materials NA, Inc. Welfare Benefit Plan (the "Plan"), to

discontinue short-term disability benefit payments to her after only a few weeks.[1]  This

_____

[1]Because the Defendant plan administrator's adverse benefit determination is the focus of
Plaintiff's challenge here, the Court will refer to the plan administrator as the sole "Defendant"
throughout the remainder of this opinion.

Court's subject matter jurisdiction over this case rests upon Plaintiff's claim for benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Presently before the Court are the parties' cross-motions to affirm or reverse Defendant's decision to discontinue short-term disability benefit payments to Plaintiff. The parties agree that the "arbitrary and capricious" standard governs this Court's review of the challenged decision, although they disagree somewhat as to the degree of deference owed to Defendant under this standard.  Nonetheless, Plaintiff maintains that the decision here must be overturned even under a deferential standard of review, where Defendant purportedly disregarded the opinion of her treating physician, and then compounded this alleged error by failing to seek an independent medical examination that might have refuted her physician's assessment of her condition.

The parties' cross-motions now have been fully briefed on both sides and are ready for decision.  Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not significantly aid the decisional process.  Accordingly, the Court will decide the parties' cross-motions "on the briefs," see Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan, following the guidelines set forth by the Sixth Circuit in Wilkins v.

2

Baptist Healthcare System, Inc., 150 F.3d 609, 619 (6th Cir. 1998).[2]  This opinion and

order sets forth the Court's findings of fact and conclusions of law.  To the extent that any

findings of fact constitute conclusions of law, they are adopted as such.  To the extent that

any conclusions of law constitute findings of fact, they are so adopted.

## II.  FINDINGS OF FACT

On April 17, 2003, Plaintiff Shelli Franek began working for Defendant

ThyssenKrupp Materials NA, Inc. as a human resources manager.  As an employee,

Plaintiff was eligible for coverage under Defendant's short-term disability benefit plan

(the "Plan").  Under this Plan, disability benefits are paid in accordance with the terms of

a group insurance policy issued by Life Insurance Company of North America ("LINA"),

with Defendant designated as the plan administrator and LINA appointed as the claims

administrator.

**A.**     **The Pertinent Plan Provisions**

Under the Plan, an eligible employee is entitled to receive disability benefits upon

furnishing "satisfactory proof of Disability."  (Plan at 5, Admin. Record ("AR") at 349.)

The requisite proof, in turn, entails a showing that, "solely because of Injury or Sickness,"

the employee is (i) "unable to perform all the material duties of [her] Regular

Occupation," and (ii) "unable to earn 80% or more of [her] Indexed Earnings from

---

[2]Specifically, Wilkins holds that neither summary judgment nor a bench trial provides an appropriate procedural basis for resolving ERISA actions to recover benefits.  Rather, the Sixth Circuit suggested that district courts generally should review challenged benefit denials "based solely upon the administrative record, and [should] render findings of fact and conclusions of law accordingly."  Wilkins, 150 F.3d at 619.

working in [her] Regular Occupation." (Id. at 14, AR at 358.)

The Plan defines an employee's "Regular Occupation" as "[t]he occupation [the employee] routinely perform[ed] at the time the Disability beg[a]n[]." (Id. at 15, AR at 359.) The duties of this occupation are not the "work tasks that are performed for a specific employer or at a specific location," but rather are determined by reference to "the duties of the occupation as it is normally performed in the general labor market in the national economy." (Id., AR at 359.)

Under the Plan, the claims administrator appointed by Defendant as plan administrator possesses the "authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." (Id. at 19, AR at 363.) In addition, all decisions made by the claims administrator are deemed to be "final and binding on Participants and Beneficiaries to the full extent permitted by law." (Id., AR at 363.) During the claim review process, the claims administrator has the authority to "require a medical examination of the Insured" at the claims administrator's expense. (Id., AR at 363.)

**B.     Plaintiff's Injury and the Pertinent Medical Record**

Plaintiff's claim for short-term disability benefits stems from injuries she suffered in July of 2003, when she fractured both of her feet in a diving accident. Following this accident, Plaintiff began experiencing lower back pain. Accordingly, on July 17, 2003, she began treatment with Dr. Peter Samet, a physiatrist, for foot and lower back pain. (AR at 113-17.) He diagnosed Plaintiff as suffering from "[l]ow back pain, most likely

4

secondary to a lumbar strain," and "[b]ilateral feet pain with a likely fracture to her 5th metatarsal phalangeal joint" and a "possibility of a tarsal tunnel syndrome." (Id. at 116.)

Dr. Samet examined Plaintiff several times over the next few months. On August 7, 2003, Dr. Samet reported that Plaintiff continued to complain of lower back pain, but that she was "currently taking Vicodin, and this is helping her." (Id. at 106.) Later that month, on August 28, 2003, Dr. Samet noted that Plaintiff was reporting increased lower back pain with "pain shooting down her left lower extremity," and he prescribed Vicodin and a Medrol Dosepak "which have to some degree alleviated her symptoms." (Id. at 103.) Nonetheless, he was concerned "that we might be dealing with a herniated disc," so he ordered an MRI of Plaintiff's lumbar spine. (Id. at 103-04.)

Following this MRI (discussed below), Dr. Samet saw Plaintiff again on September 11, 2003, observing that she was continuing to experience "severe left sided low back pain radiating into her left lower extremity," but that she was "taking Lortab which is providing some relief." (Id. at 226.) Dr. Samet prescribed "a course of physical therapy, which will include traction," recommended that Plaintiff continue with her medications, and asked her to return for "a recheck in two months." (Id. at 226-27.)

Plaintiff next visited Dr. Samet on October 9, 2003, "continuing to complain of low back pain and pain radiating into her left lower extremity." (Id. at 93.) Despite about a month of physical therapy, Plaintiff reported that she had not "noticed any relief of her symptoms." (Id.) Dr. Samet noted that "[o]ne area of further concern is that she has been getting quite depressed about this and how this has been affecting her life, particularly she

5

just got married, and she has a new job." (Id.) He instructed Plaintiff to continue her physical therapy, and cautioned "that she should not expect to necessarily be considerably improved after only one month, and that this may take four to six months altogether to get better." (Id. at 94.) Dr. Samet also recommended an increased dosage of the medication Plaintiff was taking for depression, and he "discuss[ed] with her that there is a possibility that her disc herniation may progress and get worse," necessitating another MRI and further treatment. (Id.)

At her next follow-up visit with Dr. Samet on October 22, 2003, Plaintiff continued to complain of low back pain, reported that her physical therapy was "somewhat difficult for her because she has a significant amount of spasms in her lumbar spine," and stated that she had been "undergoing a lot of emotional stress and depression." (Id. at 91.) Dr. Samet reported that Plaintiff's "physical examination remains unchanged," recommended that she continue her course of physical therapy, and advised her of his belief that "at this point . . . conservative treatment would be best for her," with "no need for any surgery." (Id.)

Plaintiff evidently next visited Dr. Samet on December 3, 2003, with her physician reporting that she was "still continuing to have about the same levels of back pain that she had all along" and that "her physical examination [wa]s relatively unchanged." (Id. at 15.) Although her medication was "providing some relief of her symptoms," Plaintiff's physical therapist had reported to Dr. Samet that Plaintiff had "plateaued in her physical therapy." (Id.) Accordingly, "after a long discussion" with Plaintiff, Dr. Samet

concurred in her request that she seek a second opinion from a neurosurgeon, and he advised her to "continue to remain off work" and continue her medication in the meantime. (Id. at 15-16.)

Dr. Samet also saw Plaintiff on December 17, 2003, when she continued to complain of "considerable back pain" that "seems to be getting worse." (Id. at 49.) Dr. Samet expressed concern that Plaintiff's "herniated disc, particularly at L4-L5, might be getting worse, possibly even causing a cauda equina syndrome." (Id.) Thus, he ordered another MRI of her lumbar spine "to determine if there is a worsening of her condition," and recommended that she continue her medications and physical therapy in the meantime. (Id. at 49-50.) Dr. Samet further observed that Plaintiff's "physical examination remains unchanged from before," and he asked Plaintiff to return in about a month, after the MRI and her scheduled visit to the neurosurgeon in early January of 2004. (Id. at 49-50.)

As noted, Plaintiff underwent three MRIs during this period in the latter half of 2003. The first was done in mid-July of 2003, shortly after Plaintiff's initial injury. At Plaintiff's initial July 17, 2003 visit, Dr. Samet observed that "[t]he MRIs of her lumbar spine were unremarkable. (Id. at 113.) Similarly, during Plaintiff's subsequent August 7, 2003 visit, Dr. Samet again remarked that this MRI "did not demonstrate any abnormalities." (Id. at 106.)

A second MRI of Plaintiff's lumbar spine was performed on September 6, 2003. This study revealed (i) "a mild levocurvature of the lumbar spine," (ii) that "[a]t L3-L4,

7

there is prominent disc material vs. subtle left foraminal/far left lateral disc herniation, without significant mass effect identified," (iii) that "[a]t L4-L5, there is diffuse posterior disc bulging with prominent disc material involving the bilateral exiting neural foramina and mild biforaminal encroachment," and (iv) that "[a]t L5-S1, there is diffuse posterior disc bulging."  (Id. at 101.)  Upon reviewing this MRI study at Plaintiff's September 11, 2003 visit, Dr. Samet opined that it "demonstrate[d] two herniated discs; one at L3-L4 to the left, and another one at L4-L5 which is causing involvement of the bilateral neural foramina."  (Id. at 99.)  He concluded that "we are dealing with the results of her falling and causing a delayed reaction with her herniated disc, which does make sense in terms of the natural history of a herniated disc."  (Id.)

Finally, another MRI study was performed on December 19, 2003, revealing "mild multilevel degenerative end plate change and degenerative disc disease of the lumbar spine."  (Id. at 24.)  This MRI again showed "prominent disc material vs. subtle far left lateral disc herniation at L3-L4 without significant mass effect identified," as well as "mild posterior disc bulging" at L4-L5 "with more prominent disc material seen to involve bilateral exiting neural foramina with mild bilateral facet degenerative changes and mild biforaminal encroachment."  (Id.)

For the first few months after her initial injury in early July of 2003, Plaintiff continued to work, evidently without restriction.  On September 16, 2003, however, Dr. Samet provided Plaintiff with a note restricting her from driving, flying, or prolonged sitting until October 16, 2003.  (Id. at 228.)  Dr. Samet then issued a similar note on

8

October 9, 2003, again restricting Plaintiff from long-distance driving, flying, or prolonged sitting for a one-month period.  (Id. at 92.)

At Plaintiff's follow-up visit on October 22, 2003, Dr. Samet reported that he and Plaintiff "both feel it would be best if she took some time off work to . . . help concentrate on her getting physically better."  (Id. at 91.)  Plaintiff's last day on the job was two days later, on October 24, 2003, after which she ceased working and applied for short-term disability benefits.

**C.    Plaintiff's Claim for Short-Term Disability Benefits**

In late October of 2003, Plaintiff filed a claim for short-term disability benefits under the Plan, listing October 25, 2003 as the date she was first unable to work.  (See id. at 7.)  On October 27, 2003, the Plan's claims administrator, LINA, acknowledged receipt of her claim, and requested that she sign authorization forms so that further medical information could be obtained from Dr. Samet and the clinic that had performed her MRIs.  On November 7, 2003, LINA requested that Dr. Samet complete a disability form, supply a copy of his office notes for Plaintiff, and provide "objective medical documentation to substantiate her claim for disability benefits."  (Id. at 77.)

Within a few days — and before Dr. Samet had responded to LINA's inquiry — Plaintiff was notified on November 11, 2003 that her claim for short-term disability benefits had been approved through November 28, 2003.  (Id. at 68.)  Plaintiff was further advised:

If you are unable to return to work full-time on 12/01/2003 due to medical

9

reasons, please have your physician complete the enclosed Follow up
Medical Request Form, along with a detailed summary of your current
treatment plan and forward to our office immediately.  Failure to do so will
result in a suspension of your benefits and your claim will be considered
closed as of 12/01/2003 . . . .  In addition, please have your physician
enclose the following:

   • Office visit notes
   • Treatment Plan
   • Test Results
   • Return to Work plan
   • Restrictions and Limitations

* _Please Note:_  *Receipt of the extension form only, indicating disability, will
not be sufficient to extend benefits past 11/28/2003.  All of the above must
be included.*

(Id. at 68.)

On November 21, 2003, Dr. Samet completed paperwork in support of Plaintiff's

request for disability benefits.  He identified the date of Plaintiff's injury as July 4, 2003,

offered a primary diagnosis of a herniated lumbar disc, and opined that Plaintiff could not

"work at present" because she could not "sit/stand for any period of time."  (Id. at 29.)

Dr. Samet further indicated that Plaintiff was currently undergoing physical therapy, and

that an MRI study had shown herniated discs at L3-4 and L4-5.  (Id.)  Finally, he

estimated that Plaintiff would be able to return to work with restrictions in one to two

months.  (Id.)

Dr. Samet also completed a "Physical Abilities Assessment Form" on November

21, 2003.  For every category of physical activity, including sitting, standing, walking,

climbing, kneeling, and reaching, Dr. Samet checked the boxes indicating that Plaintiff

10

had no ability whatsoever to perform these activities.  (See id. at 30.)  More generally, he opined that Plaintiff could not perform any sort of work at any exertional level.  (See id. at 31.)  Although Dr. Samet was asked on this form to "provide copies of supporting reports such as office notes/consultations/testing," no such materials accompanied this form when it was submitted to the claims administrator.

On December 3, 2003, Dr. Samet completed another form in support of Plaintiff's claim for benefits.  He again cited a primary diagnosis of a herniated lumbar disc, and again opined that Plaintiff was unable to work.  (Id. at 17.)  This time, however, Dr. Samet was unwilling to estimate when Plaintiff could return to work, stating that this was "unknown."  (Id.)  Once again, this form was unaccompanied by any supporting documentation such as office notes or test results.

When this supporting documentation was not forthcoming, LINA's medical director, Dr. John Mendez, contacted Dr. Samet on December 9, 2003 to ascertain the basis for his opinion that Plaintiff was unable to work.  Dr. Mendez recounted this conversation as follows:

> [Dr. Samet] believes [Plaintiff] continues to be unable to perform her job duties because of her continuing back and leg pain.  She has told him she cannot sit for long periods of time without discomfort.  She is also recently married and provider attributes anxiety and stress to her inability to spend time with her husband as she would like to, not to work factors.  He has not measured her clinically for any functional deficits relative to her work duties and stated his recommended restrictions are primarily based on her reported symptoms and MRI findings.

(Id. at 187.)

Following this conversation, Dr. Mendez opined that Plaintiff's disability claim was "not supported from 11/28/03 to the present."  (Id.)  In support of this conclusion, Dr. Mendez noted that Plaintiff's "original injury occurred in July 2003, three months before she stopped working, without any documented deficits in her ability to perform her work duties."  (Id.)  In Dr. Mendez's view, Plaintiff's evident ability to perform her job during this three-month period was not overcome by Dr. Samet's recent opinion to the contrary, where the restrictions imposed by Dr. Samet appeared to be based principally upon Plaintiff's self-reports of lower back and leg pain.  (See id.)

On December 19, 2003, Plaintiff was notified that her short-term disability benefits would not be extended beyond November 28, 2003.  The claims administrator explained:

> On November 11, 2003, we mailed an approval letter to your home address advising that your claim for short term disability benefit[s] had been approved through November 28, 2003.  The letter included a medical request form and requested a detailed summary of your current treatment plan in the event you were unable to return to work on December 1, 2003. It also requested copies of your medical office notes, treatment plan, test, results, return to work plan, and specific restrictions and limitations.  We contacted you on December 4, 2003 to advise that we did receive the medical request form but the supplemental information was not included. Upon your request we contacted Dr. Samet's office again for the supplemental information.
>
> Our medical director contacted Dr. Samet and personally spoke with him regarding your disability claim.  Dr. Samet disclosed that you were unable to perform your job duties because of continued back and leg pain. He also stated that you advised you were unable to sit for long periods of time without discomfort.  He reported that he had not clinically measured any functional deficit relative to your work duties and concluded that his recommendation was primarily based on your reported symptoms and MRI

12

findings.  In addition, we contacted Thyssenkrup[p] for a copy of your current job description.  Thyssenkrup[p] advised that they were unable to accommodate the restrictions set by Dr. Samet at this time.

* * * *

Following a complete and thorough review of the information provided by your physicians, Thyssenkrup[p], and yourself we have concluded the following claim decision.  This claim for Short Term Disability benefits has been denied, as you did not satisfy the definition of disability.  The restrictions are not substantiated by objective medical documentation.  To date, we have not received any objective medical documentation to support disability beyond November 28, 2003.  The subjective information provided by your physician does not provide objective documentation of any functional deficit or impairment that would preclude your ability to perform your job as a Human Resources Manager. As a result, this claim has been denied.

(Id. at 71-72.)  Plaintiff was advised of her right to seek administrative review of this decision, and was invited to submit additional documentation in support of her claim of disability.  (Id. at 73.)

Plaintiff pursued an administrative appeal on March 8, 2004.  In support of this appeal, she submitted additional documentation consisting of:  (i) Dr. Samet's reports of Plaintiff's visits on December 3, 2003, December 17, 2003, and April 13, 2004, (see id. at 15-16, 49-50, 18-19); and (ii) the radiology report from the MRI study conducted on December 19, 2003, (see id. at 24-25).  This appeal was denied on June 22, 2004, with the claims administrator again opining that Plaintiff had not "provided . . . objective medical documentation, such as clinically measured deficits, physical limitations, etc. supporting a decrease in functionality or severity of symptoms which would have prevented [Plaintiff] from performing the essential duties of [her] occupation beyond 11/28/03."  (Id. at 4.)

13

This suit followed, with Plaintiff contending that the decision to discontinue her short-term disability benefits was arbitrary and capricious.

### III.  CONCLUSIONS OF LAW

A.     The Standards Governing  the Parties' Cross-Motions

A participant in or beneficiary of an ERISA qualified plan may bring suit in federal district court to recover benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  Courts review *de novo* a denial of benefits challenged under this provision, unless the benefit plan confers upon the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a more deferential "arbitrary and capricious" standard applies.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996).

Here, the parties agree that the "arbitrary and capricious" standard governs the Court's review, in light of the Plan provision that confers upon the claims administrator the "authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact."  (Plan at 19, AR at 363.)  This standard is the "least demanding form of judicial review," under which this Court must uphold a denial of benefits if it is "rational in light of the plan's provisions."  Monks v. Keystone Powdered Metal Co., 78 F. Supp.2d 647, 657 (E.D. Mich. 2000) (internal quotation marks and citations omitted), aff'd, 2001 WL 493367 (6th Cir. May 3, 2001).  "When it is possible to offer a reasoned explanation,

14

based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citations omitted), cert. denied, 495 U.S. 905 (1990). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." Marchetti v. Sun Life Assurance Co., 30 F. Supp.2d 1001, 1008 (M.D. Tenn. 1998).

Nonetheless, Plaintiff correctly observes that the Court's deferential review is tempered somewhat by the existence of a conflict of interest, where Defendant both funds and administers the Plan. As this Court has elsewhere explained, while such a conflict of interest does not warrant the outright abandonment of the "arbitrary and capricious" standard in favor of *de novo* review, it "should be taken into account as a factor in determining whether the [administrator's] decision was arbitrary and capricious." Monks, 78 F. Supp.2d at 657 (internal quotation marks and citations omitted); see also Evans v. UnumProvident Corp., 434 F.3d 866, 876 (6th Cir. 2006). Where such a conflict is present, "[t]he reviewing court looks to see if there is any evidence that the conflict in any way influenced the plan administrator's decision." Evans, 434 F.3d at 876.

Finally, in reviewing Defendant's decision, the Court is "confined to the record that was before the Plan Administrator," and "may not admit or consider any evidence not presented to the administrator." Wilkins, 150 F.3d at 615, 619. The pertinent record, however, is not limited solely to the evidence before the administrator at the time of its

15

initial decision, but also includes materials considered during the administrative appeals process. Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991).

**B.    Defendant's Discontinuation of Plaintiff's Short-Term Disability Benefits Was Not Arbitrary and Capricious.**

With the above standards in mind, the Court now turns to the benefit determination at issue here. In challenging Defendant's decision to discontinue her short-term disability benefits, Plaintiff principally contends that Defendant failed to give proper weight to the opinion of her treating physician, Dr. Samet, that she was unable to perform virtually any physical activity or to work at any exertional level. Plaintiff further asserts that Defendant's decision should be overturned for lack of an independent medical evaluation that might have refuted Dr. Samet's opinion that Plaintiff was unable to work. The Court considers each of these contentions in turn.

As Plaintiff recognizes, the Supreme Court has expressly rejected the application of a so-called "treating physician rule" in the context of ERISA claims for benefits, explaining that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003). While cautioning that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," the Court declined to "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Nord, 538 U .S. at 834, 123 S. Ct.

16

at 1972 (footnote omitted).

In the wake of the Supreme Court's ruling in Nord, "routine deference to the opinion of a claimant's treating physician is not warranted."  See Kalish v. Liberty Mutual/Liberty Life Assurance Co., 419 F.3d 501, 508 (6th Cir. 2005) (internal quotation marks and citation omitted).  Rather, this Court's task is to consider whether Defendant's decision rests upon reliable grounds, such as objective medical evidence or the opinions of qualified physicians, even though this evidence might conflict with the views of Plaintiff's treating physician, or whether Defendant instead acted arbitrarily and capriciously by crediting unreliable evidence or relying on opinions that are unworthy of credence.  See, e.g., Vick v. Metropolitan Life Insurance Co., 417 F. Supp.2d 868, 877-81 (E.D. Mich. 2006); Bauer v. Metropolitan Life Insurance Co., 397 F. Supp.2d 856, 864-66 (E.D. Mich. 2005).

The key question in this case, then, is whether Defendant acted arbitrarily and capriciously by declining to defer to Dr. Samet's opinion that Plaintiff was unable to work.  This Court recently addressed a similar issue in Wyss v. Kemper Employers Insurance Co., No. 03-74571, 2006 WL 2594861 (E.D. Mich. Sept. 8, 2006).  There, as here, the plaintiff's treating physician, Dr. Miller, opined that the plaintiff was unable to work, but the defendant claims administrator gave little or no weight to this opinion. Wyss, 2006 WL 2594861, at *9.  Instead, the defendant chose to rely on the opinion of a peer review physician, reached after a review of the medical record but without examining the plaintiff, that this record was devoid of findings indicating that the plaintiff

17

was unable to perform the essential functions of her job.  2006 WL 2594861, at *9.

In holding that the defendant's decision to deny short-term disability benefits was not arbitrary and capricious, this Court addressed (and rejected) the plaintiff's contention that the defendant's chosen peer review physician, Dr. Zane, had effectively rewritten the terms of the benefit plan by noting the lack of "objective findings" in support of Dr. Miller's conclusion that the plaintiff was unable to work:

> The Plan . . . vests Defendant with the discretion to "interpret all policy terms and conditions," and to "[d]etermine whether proof of [a claimant's] loss is satisfactory" to warrant an award of disability benefits.  As Judge Lawson of this District has observed, "it is not unreasonable for a plan administrator to seek a medical or psychiatric explanation tying the conclusion that a claimant is disabled to some medical finding that supports it."  *Bauer,* 397 F. Supp.2d at 865.  Moreover, because "the plan provisions at issue define disability in terms of functional limitations that prevent an employee from performing her job," the determination of Plaintiff's eligibility for benefits necessarily turns upon "an assessment of what [Plaintiff] can and cannot do, not what she does and does not suffer from." 397 F. Supp.2d at 865.

> Viewed in this context of the Plan's definition of a "disability," Defendant permissibly relied upon Dr. Zane's observation regarding the absence of "objective findings or data referable to an impaired level of functionality."  As noted in *Bauer,* 397 F. Supp.2d at 865, it is not enough that Plaintiff produce evidence, whether in the form of treating physician records or otherwise, that she suffered from one or more recognized medical conditions.  Rather, she must produce evidence that these conditions rendered her "disabled" within the meaning of the Plan by precluding her from performing the essential functions of her job.  *See Vick,* 417 F. Supp.2d at 880 (noting that the treating physicians in that case "explained how Plaintiff's condition functionally limited her capacity to work").

> As Dr. Zane accurately observed, the record is virtually silent on this latter point.  While Dr. Miller diagnosed Plaintiff as suffering from various conditions and prescribed various treatments, his records from the pertinent

18

period fail to identify any resulting restrictions or limitations that might
impair Plaintiff's ability to perform her job.  At most, he noted only that
certain activities tended to exacerbate Plaintiff's reports of pain — and,
even then, Dr. Miller's notes on this point merely recount what Plaintiff told
him, rather than reflecting his own findings based on testing or
examination.  Under these circumstances, Defendant permissibly could
have given little or no weight to Dr. Miller's conclusory statement that
Plaintiff was "unable to work."  By the same token, Defendant could
properly rely upon Dr. Zane's conclusion, following his review of the
medical record, that this record was devoid of any medical findings that
would reflect Plaintiff's inability to perform the essential functions of her
job.

Wyss, 2006 WL 2594861, at *8-*9 (citations and footnote omitted).

This same reasoning is applicable here.  In this case, as in Wyss, Defendant's

denial of benefits rests principally upon the absence — in its view, at least — of objective

medical support for Dr. Samet's opinion that Plaintiff was unable to work.  And, indeed,

in his initial submissions to Defendant in connection with Plaintiff's claim for disability

benefits, Dr. Samet provided no medical records whatsoever in support of this opinion.

Rather, he merely stated on one single-page form that Plaintiff could not sit or stand for

any period of time because of a herniated lumbar disc, and thus was unable to work, (see

AR at 29), and he also completed a two-page checklist indicating that Plaintiff could not

perform virtually any physical activity and was incapable of work at any exertional level,

(see id. at 30-31).[3]  Although Dr. Samet was asked in each of these two forms to provide

copies of supporting medical reports, it is uncontested that he did not do so.  Defendant

---

[3]Notably, Dr. Samet was requested on this latter form to check a box for each of his
various assessments of Plaintiff's physical limitations that was supported by objective findings,
and yet he failed to check any of these boxes.  (See id. at 30.)

surely would not have acted arbitrarily and capriciously, then, in determining that this first set of submissions — consisting solely of the bare, conclusory opinions of Plaintiff's treating physician — did not establish Plaintiff's entitlement to disability benefits.  See Storms v. Aetna Life Insurance Co., 156 Fed. Appx. 756, 758-59, 2005 WL 2175997, at *2 (6th Cir. July 29, 2005) (noting that a treating physician's opinion may properly be discounted if it is "conclusory" and "not supported by objective medical data, useful analysis, or the other opinions in the record").[4]

Even when Defendant actively and explicitly invited Dr. Samet to identify objective medical grounds for his opinion that Plaintiff was unable to work, he was unable to do so.  Specifically, when no office records were forthcoming from Dr. Samet, he was contacted by LINA's medical director, Dr. Mendez, in an effort to determine the basis for his opinion that Plaintiff was unable to work.  During the course of this conversation, Dr. Samet reportedly stated that he had "not measured [Plaintiff] clinically for any functional deficits relative to her work duties," but that his "recommended restrictions [we]re primarily based on her reported symptoms and MRI findings."  (AR at 187.)  Despite this effort by Defendant, then, Dr. Samet's opinion remained largely ungrounded in any test results or objective medical findings.

_____

[4]Indeed, as observed in Storms, 156 Fed. Appx. at 758, 2005 WL 2175997, at *2, even in the Social Security context, where a treating physician's opinion *is* presumptively entitled to greater weight, such an opinion nonetheless may be discounted if it is not supported by medical evidence.  See, e.g., Wilson v. Commissioner of Social Security, 378 F.3d 541, 544 (6th Cir. 2004) (surveying the permissible grounds for according less weight to a treating physician's opinion).

20

To be sure, Dr. Samet did point to MRI studies as a basis for his opinion, both in the one-page medical request form he completed on November 21, 2003, (see id. at 29), and in his subsequent conversation with Dr. Mendez, (see id. at 187).  In addition, Dr. Samet's office  records were eventually produced, in time for Defendant to review them before reaching its December 19, 2003 decision to discontinue Plaintiff's disability benefits.  In light of these materials, Plaintiff argues that Defendant acted arbitrarily and capriciously in continuing to insist, both in its initial decision and on administrative appeal, that her claim of disability was not substantiated by objective medical documentation.

As this Court explained in Wyss, 2006 WL 2594861, at *8, however, "it is not enough that Plaintiff produce evidence, whether in the form of treating physician records or otherwise, that she suffered from one or more recognized medical conditions."  Rather, "she must produce evidence that these conditions rendered her 'disabled' within the meaning of the Plan by precluding her from performing the [material] functions of her job." Wyss, 2006 WL 2594861, at *8.  The evidence cited by Plaintiff here suffers from precisely this deficiency.  While the MRI studies revealed herniated discs, and while Dr. Samet's office notes reflect Plaintiff's continuing complaints of pain and his resulting treatment recommendations, including physical therapy, medication, and referral to a neurosurgeon, there is nothing in this medical record that links Plaintiff's acknowledged back condition and accompanying pain to specific limitations upon her ability to perform any particular job functions.

21

The only documents in the record that even attempt to forge such a link are Dr. Samet's November 21, 2003 submissions in which he (i) attributed Plaintiff's inability to work to her herniated discs as disclosed in an MRI study, (AR at 29), and (ii) opined that Plaintiff was utterly unable to perform any sort of physical activity, (id. at 30). As discussed, however, these documents consist solely of conclusory opinions, with no effort made to explain or cite medical support for Dr. Samet's view that Plaintiff's back condition was completely debilitating. There is no evidence, for example, of physical examination or testing of Plaintiff in the surrounding time period that might have identified specific limitations on Plaintiff's ability to meet the physical demands of her job. To the contrary, the limited record on this point suggests that Plaintiff *was* able to meet some or all of these demands despite her condition — she continued to work until October 24, 2003, despite the herniated discs as revealed in a September 6, 2003 MRI study (which, of course, provided the basis for Dr. Samet's subsequent opinion that Plaintiff was unable to work).[5]   Under these circumstances, the Court cannot say that

---

[5]Given that Dr. Samet had already concluded on the basis of the September MRI that Plaintiff was unable to work, it matters little that a subsequent December 19, 2003 MRI study revealed a purportedly "worsened" condition. (Plaintiff's Motion, Br. in Support at 3.) As an initial matter, it is not self-evident from the reports of the September and December MRI studies that Plaintiff's condition had worsened in the interim. In any event, because Dr. Samet is the only medical professional who opined that Plaintiff was unable to work, and because he had already reached this conclusion prior to the December MRI, any worsening in Plaintiff's condition that might have been revealed in the later study cannot assist Plaintiff in identifying medical support for her claim of disability. At best, the December MRI merely confirms the existence of a condition that possibly could have impaired Plaintiff's ability to do her job. By itself, this says nothing about *whether* or *how* this condition *actually affected* Plaintiff's ability to perform the material duties of her job.

22

Defendant acted arbitrarily or capriciously in finding that Plaintiff had not produced sufficient proof of a "disability" as defined by the Plan.

Nor can the Court conclude, under these circumstances, that Defendant was obliged to obtain an independent medical examination in order to properly refute or discount Dr. Samet's opinion.  To be sure, the existence of an opposing, well-reasoned and well-supported view provides one possible basis for a claims administrator to discount the opinion of a treating physician.  See, e.g., McDonald v. Western-Southern Life Insurance Co., 347 F.3d 161, 169 (6th Cir. 2003).  In addition, the Sixth Circuit has recognized that "a disability determination based on a file review alone may, in some instances, be an indication that the administrator's decision was arbitrary and capricious." Smith v. Continental Casualty Co., 450 F.3d 253, 263 (6th Cir. 2006); see also Calvert v. Firstar Finance, Inc., 409 F.3d 286, 295 (6th Cir. 2005).

There was no need for such an independent medical examination here, however.  If Defendant had discounted Dr. Samet's opinion on the basis of differing medical judgments, for example, or had made a credibility determination that Dr. Samet gave undue weight to Plaintiff's subjective complaints of pain, it would have been necessary for Defendant to produce independent support for such a conclusion.  Instead, however, Defendant discounted Dr. Samet's opinion for lack of supporting medical evidence.  Assuming that this was a permissible ground for giving little or no weight to Dr. Samet's opinion — and the Court already has explained that it was — Plaintiff was left with no evidentiary support for her claim of disability.  Under these circumstances, it was

23

unnecessary for Defendant to seek additional support, whether through an independent medical examination or otherwise, for a conclusion that already was permissible under the existing record — namely, that Plaintiff had not produced sufficient proof of disability to warrant the continuation of benefits beyond November 28, 2003.

It remains only to consider whether Defendant's decision was influenced by its conflicting duties to administer and pay benefits under the Plan. As in Wyss, 2006 WL 2594861, at *10, Plaintiff here "has failed to identify any aspect of Defendant's determination or its decisionmaking process that might have been influenced by these competing interests." Accordingly, Defendant's conflicting interests provide no basis for overturning its decision to discontinue Plaintiff's short-term disability benefits.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion to reverse the administrator's decision is DENIED. IT IS FURTHER ORDERED that Defendant's motion for entry of judgment affirming the plan administrator's decision is GRANTED.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: January 11, 2007

24

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 11, 2007, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager